Bissell, J.
The brevity of the testimony occasions ns some difficulty in stating the controversy. We can find enough to state the *186 issue which ought to have been tried and point out the course which must be pursued on the subsequent trial.
MePhee & McGinnity were lumber dealers in Denver. McAlpine had a contract with the Maxwell Land Grant Company to cut annually a certain number of trees on the grant, paying that corporation for the timber according to the stumpage. There was no specified time within which any part of the amount other than the annual limit should be cut. McAlpine had some arrangement with MePhee & McGinnity by which they were guarantors of his performance. The agreement as to this land grant contract is not at all conclusive on the rights of the parties, though it may have had some bearing on one matter of controversy between them which was the alleged condition attached to an agreement which we shall ultimately state. After McAlpine made his arrangements with MePhee & McGinnity he went to Catskill and put up several sawmills for the production of lumber. He built these mills with his own funds, and then made an agreement with MePhee & McGinnity with reference to the sale and delivery of lumber. Exactly how much he was to deliver each month was not shown, but what was not delivered was to be stored and piled at the mills, either for seasoning purposes, or to await the demands of the market in Denver, and was to be shipped on the firm’s orders. Under this contract McAlpine cut a large amount of lumber. He was paid a specified price out of which came the freight which was settled by MePhee & McGinnity. The balance covered the stumpag’e, the expenses of operation, and McAlpine’s profit for the work. The lumber shipped during any one month was to be paid for on the 15th of the next calendar month. A good deal of lumber was cut and shipped. In the month of June, 1898, McAlpine got into some financial difficulties and owed his men considerable money. On June 19, he came to Denver to adjust the account for May, and received from MePhee & McGinnity f845.40. This covered what was due him for the May shipments. It would seem from questions put to the witness as well as from what crept out dur *187 ing’ the examination that between the 1st and 19th of June a good deal of lumber had been shipped to Denver. The parties had some talk about future shipments and the difficulty which he was having with his men at the mills. He had not been prompt in their payment, and the mill men were threatening to strike and quit work unless they were paid what was due. He stated to the firm that it would be impossible to run the mills unless he could secure enough money to pay his men what was due them. Jt was then proposed that if he would return the check for §845.40 McPhee & McGinnity would advance- him §2,500 providing he would pay five per cent for the use of the money until the 15th of July. To tins he assented, returned the check and they agreed to honor his orders up to §2,375 plus the §845.40. The money was not to be paid McAlpine directly, nor was he to control it, but he was to give orders to his debtors which the firm was to pay on presentation. These orders were all in this form : They were dated as of Catskill, New Mexico, in June, directed to McPhee & McGinnity, and recited : “ Pay to the order of dollars, and charge to my account,” and were signed by McAlpine. Most if not all of them were indorsed by E. A. Gibson with the words, “This man has worked for McAlpine at mill.” It appears McPhee & McGinnity had an employee at the mills to supervise the cutting, piling, and shipment of the lumber, and probably to keep general oversight of what was being done. It was agreed that'orders should be indorsed by Gibson that the firm might be assured they were drawn to liquidate the labor account. This agreement as we have stated it was substantially conceded by the parties. The offiy dispute between them was about a condition under which the appellees insist the agreement was made. Both McPhee & McGinnity testified they agreed to provide this §2,375 on condition that McAlpine should keep the mills running and continue to cut lumber. McAlpine denied it. The terms and form of the condition, if it may be properly called such, are not clearly stated in the testimony. The question might perhaps be *188 resolved either one way or the other, but the matter was submitted to the jury which' found that the advance was made on this condition. We have no desire to disagree with the jury nor to express any doubt about it, for the same matter will be submitted to another jury. We simply state it was asserted on one side and denied on the other. The $2,375 is treated in the argument as an advance and as though McPhee & McGinnity were paying out money which they did not owe McAlpine in order to enable him to pay his debts. We cannot state whether this position is well taken or can be supported by competent proof. It would look otherwise, though it may be that as to some part of it, it is true. The appellants offered evidence to the point that in June McAlpine had shipped a large amount of lumber. The firm would thus become indebted to McAlpine on the 15th of July for the price of this lumber. If the shipments would amount at the agreed price to $2,375, the money which the firm was to pay out on these orders was not an advance in the sense in which the word is used by bankers and business men to signify a payment of their own funds on the orders of another, looking to subsequent security or reimbursement. It was simply an agreement by debtors to discount their bills and to pay them before they matured for the consideration of the five per cent, to wit, the $125. In any event as to the $845.40 it was no advance at all; they had his money. If they had any lumber which had been shipped prior to the 19th of-June, for which they were bound to pay ón the 15th of July, it was to that extent not an advance, but an agreement to mature the debt, anticipate the payment and disburse what in reality and in law- were McAlpine’s funds. For this there was an ample consideration in the five per cent discount. We are very careful in stating the situation because the evidence respecting this matter was all ruled out by the court.
The present suit was brought by Fowler & Underwood as the purchasers and holders of some of these orders by transfer from the payees. Fowler & Underwood established their copartnership, the purchase of the orders and that they were *189 presented and not paid. They offered evidence of McAlpine’s statements to them when they bought them. They offered to show that McAlpine told them oE McPhee & McGinnity’s agreement to pay the orders as they were presented before they parted with their money. This evidence was ruled out. During the trial the plaintiffs produced a statement rendered by McPhee & McGinnity in the following December showing the state of the account between McAlpine and the firm. This was rejected except as to the items dated the 19th of June. The court refused to permit it to be otherwise used, either as explanatory of the transaction in June or as tending to overcome McPhee & McGinnity’s contention that the running of the mills was a condition precedent to the payment of McAlpine’s orders. The account shows the $125 still charged. It also shows divers orders bearing date in June as paid by McPhee & McGinnity under the terms of the agreément. The orders were never returned, but were held and many of them were charged up in the account. After the agreement -was made McAlpine returned to Catsldll. On his way he paid some bills in Trinidad by orders which were honored and when he reached Catsldll issued those in suit to pay the men. Fowler & Underwood offered to prove that they bought them on the strength of McAlpine’s statements of the contract with McPhee & McGinnity. Checks were sent to pay these orders. Gibson was ordered not to deliver them when advices reached Denver on the 26th or 27th of June that the mills had stopped. The men were on a strike. They feared the nonpayment of their wages. Matters were not adjusted when McPhee & McGinnity refused to carry out the agreement, alleging as an excuse the nonperformance of the condition. The plaintiffs tried to show that McPhee & McGinnity afterwards took possession of the mills. This was to establish the fact of a discussion with McAlpine as to the propriety of leaving the mills closed because of overproduction and the lack of demand for lumber, and the absence of a condition of forfeiture in the coirtract with the land grant company. All this it was insisted would at least *190 tend to show there was no such condition imposed when the firm agreed to pay the orders. This evidence was all excluded.
As we view it, the court misconceived the relation of the parties and their rights under this agreement. The case has been argued here and was treated by the court below as one involving an inland bill of exchange, and since the promise to accept was prior to the creation of the bill and was coupled with a condition, the condition became one precedent and the defendants could refuse payment and prove the nonperformance in bar of a recovery. We are cited to no case which has laid down this principle and applied it to circumstances like the present, which, as the proof is, shows an agreement to accept by one who would suffer no loss by the breach of the condition. In the case of Mason v. Hunt, 1 Douglas, 296, the firm which was sued for nonacceptance proved that their agreement to accept was based on a contract to ship a certain amount of tobacco of a definite quality. A shipment of a less amount of an inferior quality followed by the acceptance would necessarily involve a loss to the firm which had agreed to take care of the bill.
Proctor v. Hartiyan, 143 Mass. 462, was the case of an order drawn by a contractor in favor of one of his creditors which was accepted with the condition that it was to be paid out of the last payment due on the contract. This was not an agreement to accept .before the bill was drawn, but was an acceptance with the condition expressed on the face of it. Manifestly, this is fairly removed from the present controversy, which was an agreement to accept a nonexisting bill on an ample consideration, and, as is ultimately decided, the plaintiffs may show, if they can, that the acceptors would suffer no loss from the enforcement of the contract. There is a wide distinction between the present case and that.
The case of Winter v. Drury, 5 N. Y. 515, is of a similar description and only holds that a draft gives the holder no lien on the funds of a creditor until he accepts it. The distinction between a bill drawn generally and one drawn in *191 terms or by contract on a particular fund, or on the money of the drawér in the hands of the drawee, is noticed as an exception to the general doctrine.
It was long a mooted question whether there could be a valid agreement to accept a bill nonexistent when the contract was made and the drawee be held to his promise to accept. While the earlier cases in England were not in harmony, the law there, now is that the drawee may not be held to his promise to accept a nonexistent bill unless it be shown the holder took it on the faith and strength of the promise. We are not at all clear nor have we taken the trouble to find out whether even in the latter case one who promises to accept can be held on his promise. Except as an interesting phase of the question it is. profitless to discuss or determine it. The matter has been set at rest in this country, and since the case of Collidge v. Payson, 2 Wheat. *66, was decided, it has been the law of the United States that one who promises to accept a nonexisting bill may be held on his promise as may one who promises to accept a bill which has already been drawn and is referred to and described and identified in the contract. There is a wide distinction noticed in most of the cases between the liability of one who promises to accept a nonexisting bill where the holder has been informed of the promise to accept before he buys the bill, and the liability of the drawee where the promise to accept has not been communicated. When and how far, and under what circumstances in the latter event, the drawee would be bound we do not decide. The present is not that case. We shall assume Fowler & Underwood could have proven McAlpine stated to them that McPhee & McGinnity promised to accept before they bought the orders. Thse question was put to one of the firm and the court would not permit it to be answered. Presumably the answer would have shown the fact of the communication of the promise and the court erred in shutting out that testimony. If the proof should be that McPhee & McGinnity agreed to accept the orders on a sufficient consideration and this promise was communicated to Fowler & Underwood before they bought the *192 orders, then without some change in the situation or some rescission of the contract before the purchase they would be entitled to recover on the promise and McPhee & McGinnity could not escape liability by proof of the condition stated. The importance of the communication of this agreement to accept is recognized in many well considered cases. Nelson v. First Nat. Bank of Chicago, 48 Ill. 36; Nelson v. Ravens, 3 Ill. App. 565; Saylor v. Bushong, 100 Pa. St. 23; Lewis v. Sawyer, 44 Me. 332; Coffman v. Clarinda Nat. Bank, 33 Ill. App. 641.
The rule was recognized although not directly commented on in the supreme court of this state. Hughes v. Fisher, 10 Colo. 383.
As the case now stands there would seem to be little doubt about McPhee & McGinnity’s liability. They held $845.40 of McAlpine’s money. Much lumber had been shipped in June and prior to the 19th when the promise was made. The extent of the shipments is not stated, nor can we tell in what sum the firm was indebted to McAlpine for the June lumber. They were undoubtedly indebted to him for whatever lumber had been shipped up to that date and received by them. We put this statement on the precise ground that McPhee & Mc-Ginnity took $125 of McAlpine’s money or made the charge against his account on the books, and they thereby, to the extent of the lumber then shipped, agreed that the debt had matured and was due as of that date for the antecedent shipments. It therefore follows on the 19th of June, McPhee & McGinnity were indebted to McAlpine in the sum of $845.40 plus the agreed price for the lumber shipped during that month. To’ this extent they held McAlpine’s funds which they were bound to apply to the payment of orders which he might draw, and unless they were able to show that prior to the purchase of the orders by Fowler & Underwood, or prior to the acceptance by the promisors of enough orders to exhaust the funds, the fund was exhausted, they were bound to pay the Fowler & Underwood orders. There were three considerations. First, the holding of $845.40 of McAlpine’s *193 money; second, the price of the lumber which had been shipped, which was a debt matured by the agreement and which they promised to pay as fast as he should draw orders on it; and third, the $125 which McAlpine consented to have charged against his account as the price of the maturity of the debt. It is always the law that a man’s own debt is a good consideration for the draft of his agent, and wherever paper is received on a credit of the debtor’s engagement, the debtor is bound to accept'the draft and to pay it when presented. The purchaser who has parted with his money may hold the promisor. Bank of Michigan v. Ely, 17 Wend. 508.
All these conditions concur. McAlpine became McPhee & McGinnity’s agent to draw these drafts. McPhee & Mc-Ginnity were debtors by the terms of their promise on the 19th of June because they had matured the debt as to all lumber antecedently shipped in that month, to which sum must be added the $845.40 of Me Alpine’s money which they concededly had. Here are ample considerations, ample proof of authority to draw and facts and circumstances which are sufficient to charge them. We are therefore quite of the opinion that this account should have been opened up and proven to the jury, the jury told the law respecting it, and if they found with the plaintiffs on the proof respecting these facts there was a consideration for the promise and authority to draw.
The condition annexed to the agreement would not relieve them, even conceding its existence. What the rule would have been had McPhee & McGinnity been advancing their own money, or what the rule would have been if it was demonstrated they would suffer loss by the acceptance and payment, we do not determine. The drafts were really drawn by an authorized agent on his own funds and were a specific appropriation of these funds to the payment of the bills or orders which he drew. McPhee & McGinnity had no right to stop the payment of the checks which they had sent to pay these orders. The orders were drawn with authority and under the promise of the drawees; they had been bought *194 by Fowler & Underwood on tbe faith and strength of that promise if the proof is so made, and before any breach of condition and before any right to rescind had accrued. What would be the rule if the rescission had been attempted prior to the drawing of the orders and their purchase we do not undertake to say. The proof offered if made would show that the orders were drawn and bought on the faith of the promise before rescission and before there had been a substantial breach of the condition alleged. This being true, the right to rescind did not inure to McPhee & McGinnity. We apply this doctrine all the more readily because there is nothing to show that the condition was so broad as to necessitate an actual resumption of work before drawing the orders. This was not the condition. As claimed the condition was that the mills were to be kept running. It was apparently known to both parties that the men were refusing to work without their money and that there had been an interruption in their regular Operations at the time McAlpine came here. There appears to have been more or less of a strike before this time, but the record does not show that the mills absolutely ceased until after the orders were drawn and bought. The plaintiffs attempted by the cross-examination of McPhee & McGinnity to show that the breach of the condition occasioned them no harm because they after-wards took possession of the mills and ran them. This was only important in one feature of the case, and that is it tended strongly to establish the plaintiffs’ contention that if there was a condition as claimed by the firm annexed to their agreement to pay these orders, no actual loss occurred to McPhee & McGinnity because they continued the operations and were thereby protected from harm. We can see the force and signification of this testimony under certain conditions which the present record does not conclusively settle. We have already suggested that even if there was a condition attached to the agreement, yet, if it was a condition, the breach of which would occasion the promisor no harm, it might not under the circumstances of this case should the *195 proof be made be a bar to the plaintiffs’ recovery. In this feature that testimony might possibly be admissible. We are unable to see or apprehend what the case may ultimately be.
On rebuttal the plaintiffs offered to prove what passed between McPhee & McGinnity and McAlpine when the December account was rendered. This proof was first offered when the plaintiffs were making out their case. It was objected to because it was not a part of their case and was only legitimate on rebuttal. The court so ruled. The plaintiffs then waited until rebuttal when this testimony was again tendered and excluded. In this we think the court erred because McGinnity’s declarations about these orders at any time after the month of June, and especially at the time the December account was given to McAlpine which contained many items embraced in the account of June, would certainly "tend to establish the plaintiffs’ theory respecting the terms and conditions of the June contract. It tended to contradict the defendants’ testimony and was clearly admissible on that basis.
A good many other errors are assigned and questions suggested in the arguments of the appellants’ counsel, but the condition of the record admonishes us that it would be wiser not to discuss them. The record is not full enough nor the-evidence definite enough to enable us to pass on them satisfactorily or clearly. The case must be reversed for the errors which we have indicated, and we think the opinion contains enough to advise the court of the theory on which this case must be tried. If thus tried there will be no trouble in so submitting the case to the jury that it can fully determine the rights of the parties. Whether the instructions complained of were or were not correct is not important because when the case is presentee! on a different hypothesis other instructions will be requisite and proper, and the principles we have expressed will enable the court to determine what ought and what ought not to be given.
For these errors which we deem material this cause must be reversed and sent back for a new trial.

Reversed.